DONALD R. McCORMICK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCormick v. Commissioner
Docket Nos. 1869-84; 1870-84.
United States Tax Court
T.C. Memo 1987-418; 1987 Tax Ct. Memo LEXIS 415; 54 T.C.M. (CCH) 242; T.C.M. (RIA) 87418; August 24, 1987. *415 P and his former wife, G, entered into an agreement with respect to their rights and obligations incident to their divorce. Such agreement required P to make specified periodic payments to G over a period of 16 years. Such payments were not related to the income of P or G and were to continue without regard to the remarriage or death of G. P's obligation to make such payments was secured by stock owned by him. The agreement stated that the parties intended that such payments be considered support payments and be taxable to G and deductible by P for Federal income tax purposes. Held:
(1) Under the facts and circumstances, the payments made by P incident to the divorce are not deductible under sec. 215, I.R.C. 1954. (2) P is not entitled to a deduction under sec. 483, I.R.C. 1954, for imputed interest with respect to such payments. Lester M. Ponder and Larry J. Stroble, for the petitioner. Elsie Hall, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined *417 deficiencies in the petitioner's Federal income taxes of $ 8,002.20 for 1977 and $ 52,745.82 for 1979. After concessions, the only issue remaining for our decision is whether periodic payments made by the petitioner to his former wife pursuant to a divorce decree are deductible under section 215, Internal Revenue Code of 1954, [1] and if not, whether the petitioner is entitled to a deduction under section 483 for imputed interest with respect to such payments. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Donald R. McCormick (Donald), resided in Vincennes, Indiana, at the time the petitions in this case were filed. He and his former wife, Gladys McCormick Tiek (Gladys) filed their joint Federal income tax return for 1977 with the Internal Revenue Service Center in Memphis, Tennessee. Donald filed his Federal income tax return for 1979 with the Internal Revenue Service Center in Memphis, Tennessee. Donald was born in Vincennes, Indiana, in 1930. His family *418 had substantial holdings of farm acreage around Vincennes and had operated farms in the area for several generations. After high school, Donald entered Purdue University, intending to major in agriculture and return to the farm upon graduation. However, in 1950, his father, Clarence, accepted an appointment to serve in Washington, D.C., as Undersecretary of Agriculture in the Truman Administration. Donald decided to leave Purdue at the end of his sophomore year and take over the management of the family farm in his father's absence. He married Gladys on June 30, 1950. At first, Donald operated the farm in partnership with Clarence. Over the years, Donald gradually purchased outright three separate tracts of farmland owned by his parents and his father's interest in the farm partnership. By 1969, Donald and Gladys owned 549 acres of farmland as tenants by the entirety. At various times, Donald raised wheat, corn, soybeans, and cattle on the farm. In 1960, he began to raise quarter horses for show and breeding purposes. From 1956 to 1960, the farm was plagued by a series of floods which caused crop production and farm income to suffer. In 1960, in an effort to supplement *419 his farm income, Doanld purchased a one-half interest in his uncle's insurance agency and began to sell liability insurance to farmers. As a result of his efforts, the agency grew steadily. When his uncle retired in 1972, Donald purchased his interest in the agency and began operating the business as a sole proprietorship. Donald and Gladys maintained their personal residence in a house located on the farm. Donald also maintained the principal office of the insurance agency in such residence. The marriage between Donald and Gladys produced three sons. Dexter was born in 1952, Donald Raymond II (Ray) was born in 1953, and Douglas was born in 1954. After the sons graduated from college, they joined Donald in the family businesses. Ray worked with Donald on the farm. Dexter and Douglas worked in the insurance agency. After the sons began working in the family businesses, Donald wanted to provide them with ownership interests in such businesses. In 1975, after consulting with his attorney, he decided to transfer the insurance business and the farm to separate corporations. He transferred the insurance operations to McCormick Insurance Agency, Inc. (McCormick Insurance). He *420 transferred the farming operation, including the farmland and the McCormick's personal residence, to McCormick Farms, Inc. (McCormick Farms). Gladys and Donald both executed the deed which conveyed the three tracts of farmland to McCormick Farms. At the time such corporations were formed, all the stock in each corporation was issued solely in Donald's name. Ray periodically received stock in McCormick Farms as a performance bonus. Donald sold Dexter one-third of the stock of McCormick Insurance after it was incorporated. Donald also sold Douglas stock in McCormick Insurance on three separate occasions. As a result of marital differences, Donald moved out of the family residence on August 1, 1977. On February 6, 1978, Gladys filed a petition for dissolution of marriage in Knox County Circuit Court. Donald was represented in the divorce proceeding by Arthur Hart, a Vincennes attorney with 49 years' experience. Gladys retained attorneys from an Indianapolis law firm to serve as counsel and Curtis Kimmel, a Vincennes attorney with 47 years' experience, to serve as local counsel in the divorce proceeding. In response to a series of interrogatories issued by Gladys, Donald stated *421 that as of April 21, 1978, he had assets of $ 917,655.08 and debts of $ 104,154.59. Donald indicated that his assets included 595 shares of stock in McCormick Farms, which he valued at $ 726,328.40, and 400 shares of stock in McCormick Insurance, valued at $ 90,899.52. Mr. Kimmel formulated his own estimate of Donald's assets. He engaged a local real estate appraiser to conduct an independent appraisal of the farmland and improvements owned by McCormick Farms. The appraiser determined that the fair market value of such farmland and improvements as of June 12, 1978, was $ 734,735.00. Such amount did not include the value of livestock, farm equipment, or farm products owned by McCormick Farms. Mr. Kimmel considered the fair market value of the farmland and improvements as determined in the appraisal, estimated the value of the other property owned by McCormick Farms, and concluded that the McCormick Farms stock owned by Donald had a fair market value of $ 1,104,981.00. In addition, Mr. Kimmel analyzed the financial statements of McCormick Insurance and concluded that Donald's interest in such business had a fair market value of $ 184,799.04. Based on such amounts and on values *422 provided by Donald of other assets owned by him, Mr. Kimmel estimated that Donald had total assets worth $ 1,431,207.64. [2]
In 1978, Donald and Gladys and their respective attorneys engaged in lengthy negotiations in an attempt to reach an agreement with respect to their rights and obligations after their divorce. During her marriage, Gladys was not employed outside the home on a regular basis. However, after the separation, Gladys worked at an insurance agency owned by her son Dexter. Her net pay from such agency was approximately $ 180 per week. She also was employed part-time as a director of the Indiana State Fair, earning approximately $ 25 to $ 35 per day plus expenses. However, she found such income to be insufficient to meet her expenses, and she was dependent on Donald's support for much of her income. For several months after Donald moved out of the family *423 residence, Gladys was able to draw checks from a joint checking account and to charge items against a joint charge account which Donald maintained. However, in August 1978, Donald closed both the checking and charge accounts. He took such action partly because he believed that Gladys' spending was excessive and partly because he was dissatisfied with the progress of the settlement negotiations and wanted to "force the issue." In September 1978, he began to pay Gladys $ 50 per week in temporary support. On December 29, 1978, Donald and Gladys entered into an agreement (the settlement agreement) which detailed their rights to property contained in the marital estate and Donald's obligation to make payments to Gladys after their divorce. Article 2 of the settlement agreement provided that Gladys was to receive $ 50,000 in cash, the choice of certain household furnishings, a silver halter used for showing horses, an old saddle, and an old bridle. She also received the right to occupy the family residence on the farm for a period of 9 months after the divorce was finalized. Donald received all other property in the marital estate, including the corporate stock of McCormick Farms and *424 McCormick Insurance, all bank accounts and cash, the family residence after Gladys vacated the premises, and the balance of the household furnishings not claimed by her. Article 7 of the settlement agreement provided: SUPPORT
Husband agrees, in recognition of his general obligation to support Wife, arising from the family and marital relationship, to make the following thirty-one (31) periodic support payments therefor to Wife: a. $ 35,000.00 within one (1) day after the date of the entry of the dissolution decree in the above referred to action, but in no event later than December 29, 1978. b. $ 15,000.00 on June 1, 1979, and a like installment of $ 15,000.00 on December 1, 1979, and a like installment of $ 15,000.00 on June 1 and December 1 of each and every succeeding calendar year to and including the year 1993 until a total of thirty (30) such semi-annual support payments have been made to Wife. It is the intent of Husband and Wife that the foregoing periodic support payments shall be taxable income to Wife and deductible by Husband for Federal Income Tax purposes. Wife and Husband each agree to file separate tax returns consistent with this expressed intent. *425 Article 8 of the settlement agreement provided that 593 shares of McCormick Farms[3] would be placed in escrow and held as security for the periodic payments. Upon default by Donald in making a periodic payment, such stock would be appraised, and Gladys would receive a sufficient number of shares to equal in value the unpaid periodic payment. The settlement agreement was approved by the Knox County Circuit Court on December 29, 1978. On the same day, the court merged and incorporated the settlement agreement into an order and decree which dissolved the marriage. There is no evidence that Donald has not complied with the terms of the settlement agreement, including his obligation to make the periodic payments to Gladys. In preparing their separate Federal income tax returns for 1979, 1980, and 1981, *426 Donald deducted the periodic payments to Gladys, and Gladys included such payments in her income, as provided in Article 7 of the settlement agreement. On his 1980 return, Donald claimed deductions in excess of his income and claimed a net operating loss with respect to such year. On March 24, 1981, he filed an application for tentative refund, in which he carried back such net operating loss to 1977. On August 24, 1983, an appeals officer of the IRS wrote Gladys' attorney to suggest that Gladys file amended Federal income tax returns for prior tax years and treat the periodic payments received from Donald as nontaxable. She had not previously considered filing such amended returns. On September 19, 1983, she filed amended returns for 1980 and 1981 only. Gladys continued to report the periodic payments as income on her Federal income tax returns for years after 1982. In his notices of deficiency, the Commissioner disallowed the petitioner's deduction for alimony for periodic payments made to Gladys in 1979 and disallowed the net operating loss which the petitioner applied to 1977. OPINION The issues for our decision are whether Donald may deduct, pursuant to section 215, *427 the periodic payments made by him to Gladys, and if not, whether Donald is entitled to a deduction under section 483 for imputed interest with respect to such payments. Section 215 allows an individual a deduction for payments made to a former spouse if such payments are includable in the former spouse's income under section 71. Section 71(a) provides in part that if a wife is divorced from her husband, the wife's gross income includes periodic payments received in discharge of a legal obligation which is imposed on or incurred by the husband under a divorce decree or under a written instrument incident to the divorce. Section 71(a) applies only to payments made because of the family or marital relationship in recognition of the husband's obligation of support contained in the divorce decree. [4]Sec. 1.71-1(b)(4), Income Tax Regs. If the husband makes periodic payments in satisfaction of the property rights of his wife, the amounts received by the wife are neither includable in her gross income under section 71 nor deductible by the husband under section 215. McCombs v. Commissioner,397 F.2d 4, 7 (10th Cir. 1968), affg. a Memorandum Opinion of this Court; Bardwell v. Commissioner,318 F.2d 786, 789 (10th Cir. 1963), *428 affg. 38 T.C. 84 (1962); Taylor v. Commissioner,45 T.C. 120, 123 (1965). The petitioner vigorously argues that the clear and unambiguous language of the settlement agreement indicates that the parties intended for the periodic payments to be for Gladys' support. He contends that the settlement agreement was entered into after lengthy negotiations between the parties, that they were both represented by experienced counsel, and that the settlement agreement was approved by the Knox County Circuit Court. For such reasons, he argues that we should leave the parties to their original bargain and refuse to recharacterize *429 the periodic payments. Whether the periodic payments made by Donald were support payments or part of a property settlement is a question of fact. Wright v. Commissioner,543 F.2d 593 (7th Cir. 1976), affg. 62 T.C. 377 (1974). We must determine the intention of the parties with respect to the payments in light of the surrounding facts and circumstances. Wright v. Commissioner, supra; Bardwell v. Commissioner supra; Suarez v. Commissioner,68 T.C. 857, 861 (1977). In making such determination, we may consider as one factor any agreement between the parties as to the treatment of such payments. However, we are not bound by the labels that the parties or a court may have placed upon such payments, even if such labels are unambiguous as to the characterization of such payments. Hesse v. Commissioner,60 T.C. 685, 691 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975); Ryker v. Commissioner,33 T.C. 924, 929 (1960). The weight to be given to the labels must be reduced when, as here, the parties are negotiating from unequal bargaining positions. Donald clearly *430 had the stronger bargaining position in this case. By August 1978, he believed that the negotiations aimed toward a divorce settlement were dragging and decided to "force the issue" by closing a joint checking account and a joint charge account that Gladys had been using to pay her household expenses. In doing so, he removed a significant source of income for Gladys. While he eventually began to pay Gladys temporary support of $ 50 per week, it appears that she was under economic pressure by the end of 1978. It is reasonable to conclude that such pressure forced her to agree to a settlement which did not reflect her true intention. [5]
Because the labels chosen by parties to a written settlement agreement may not reflect their true intentions, courts often look to objective factors such as: (1) Whether a fixed amount is stated in the agreement; *431 (2) whether the payments are related to the income of either spouse; (3) whether the payments are to continue without regard to the remarriage or death of the wife; (4) whether the wife relinquishes property rights or gives other consideration in exchange for the payments; and (5) whether the husband's obligation to make the payments is secured. See, e.g., Watkins v. Commissioner,53 T.C. 349, 360 (1969); Thompson v. Commissioner,50 T.C. 522, 526-527 (1968). In this case, all these factors indicate that the payments to Gladys were a part of the property settlement. Article 7 of the settlement agreement required Donald to pay Gladys a fixed amount of $ 485,000 over a 16-year period. Under such agreement, there was no relationship between the amount of such payments and Donald's income after the divorce. Moreover, the agreement did not provide for a change in the amount of such payments in the event that Gladys found suitable employment. Throughout the negotiations leading to the settlement agreement, Gladys indicated that she was concerned that her sons be secure financially in the event of her death. Accordingly, the settlement agreement provides *432 that the periodic payments are to continue even upon Gladys' remarriage or death. In addition, the periodic payments were secured by 593 shares of McCormick Farms. Article 8 of the settlement agreement provides that such stock is to be held in escrow and that, if a periodic payment is missed, the stock would be appraised and stock of a value equal to the missed payment would be distributed to Gladys. Indiana State law recognizes that the activities of one spouse as a homemaker have a value and contribute to the acquisition of property during the marriage. See Temple v. Temple,435 N.E.2d 259, 262 (Ind. App. 1982). For such reason, a homemaker-spouse is entitled to share in the marital property upon dissolution of the marriage, without regard to whether such spouse made a financial contribution to the purchase of such property or whether the title to such property was in such spouse's name. See, e.g., Temple v. Temple, supra;Finley v. Finley,422 N.E.2d 289, 300 (Ind. App. 1981). In a divorce proceeding, an Indiana State court must consider the contribution of a homemaker-spouse and divide the marital property in a "just and reasonable *433 manner." Ind. Code Ann. sec. 31-1-11.5-11(a) (Burns 1978). We believe that the periodic payments were intended to serve as consideration for the relinquishment by Gladys of her rights to property accumulated during her marriage. The record contains two estimates of Donald's net worth at the time of the divorce. The estimate prepared by Gladys' attorney indicates that Donald's net worth at such time was approximately $ 1,325,000. Donald's own estimate showed that his net worth was about $ 813,500. [6] The average of these two estimates is $ 1,069,250. The total of the periodic payments and the cash received under Article 2 of the settlement agreement amounts to $ 535,000. We observe that this amount is almost exactly one-half of the average of the two net worth estimates contained in the record. We also note that without the periodic payments, Gladys received slightly more than $ 50,000 of a marital estate with a minimum value of approximately $ 815,000. For such reasons, we conclude, from *434 the facts and circumstances of this case, that, in spite of the labels which the parties attached to the periodic payments, such payments were designed to be made by Donald in satisfaction of Gladys' property rights and were not support payments deductible by him under section 215. We must now consider whether Donald is entitled to a deduction under section 483 for imputed interest attributable to the periodic payments made by him. When property is sold and payment is to be made in installments for which either no interest, or an unreasonably low rate of interest, is provided, section 483 treats an appropriate part of the deferred payments as interest both to the buyer and the seller for tax purposes. By its terms, section 483 is limited to situations involving the "sale or exchange of any property." The petitioner now argues that section 483 applies also to property settlements incident to a divorce. The Third Circuit considered this identical question in Fox v. United States,510 F.2d 1330 (3d Cir. 1975). In Fox, the taxpayer and his former wife entered into a written agreement for the division of property incident to their divorce. Such agreement provided *435 that the taxpayer was to pay his former wife $ 1 million over a period of 9-1/2 years and further provided that such payments were to be made without interest. The Third Circuit held that the taxpayer was not entitled to deductions for imputed interest with respect to such payments. It held that Congress did not intend section 483 to apply to property settlements incident to a divorce and that a husband may only deduct those payments incident to a divorce which are permitted by section 215. 510 F.2d at 1335. This Court adopted the Fox court's conclusion in Gammill v. Commissioner73 T.C. 921 (1980), affd. 710 F.2d 607 (10th Cir. 1982). We thus conclude that the petitioner is not entitled to deductions for imputed interest attributable to the periodic payments made by him. The petitioner cites Gerlach v. Commissioner,201 Ct. Cl. 884 (1973), which allowed a deduction under section 483 with respect to payments made incident to a divorce. However, the court in Gerlach did not squarely address the issue of the applicability of section 483. It merely noted that the parties agreed that section 483 applied and held *436 that therefore the taxpayers were entitled to judgment to that effect. 201 Ct. Cl. at 884. Thus, the Gerlach court did not examine the scope of section 483, but rather accepted the government's concession as to the question. We prefer to base our conclusion on the well-reasoned analyses contained in Fox and Gammill.
Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated. ↩
2. It is clear that Mr. Kimmel's estimates took into consideration stock in McCormick Insurance that had been transferred to the McCormick sons, but is is not clear whether any stock in McCormick Farms had been transferred to Ray at that time or whether Mr. Kimmel's estimates considered any such transfers. ↩
3. Article 8 of the settlement agreement requires that 593 shares of McCormick Farms owned by Donald be placed in escrow. We observe that Donald, in his response to Gladys' interrogatories, indicated that he owned 595 shares of McCormick Farms. The parties have made no attempt to explain this discrepancy, and the existence of such discrepancy has no effect on our decision. ↩
4. Sec. 71 has been amended by the Deficit Reduction Act of 1984, sec. 422, Pub. L. 98-369, 98 Stat. 795, and there is no longer a requirement that the payments arise out of an obligation of support. However, the new rules apply only with respect to divorce or separation before Jan. 1, 1985, but modified on or after such date if the modification expressly provides that the amendments are to apply to such modification), and are thus not applicable to this case. Deficit Reduction Act of 1984, sec. 422(e), Pub. L. 98-369, 98 Stat. 798. ↩
5. Under sec. 71, as amended by sec. 422 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 795-796, the parties to a divorce settlement can agree to shift the tax consequences of a payment of alimony; that is, they can agree that a payment of alimony will not be deductible by the husband and not taxable to the wife. ↩
6. The difference between the two estimates is primarily attributable to the different values placed on the stock of McCormick Farms and McCormick Insurance owned by the petitioner. ↩